IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:25-CV-34-BO-KS

DANIEL DAHLMAN and JULIANNE )
DAHLMAN, )
 )
      Plaintiffs, )
 )
v. )      O R D E R
 )
WASHINGTON MONTESSORI, INC., )
d/b/a WASHINGTON MONTESSORI )
PUBLIC CHARTER SCHOOL, and JAMIE )
MIDGETTE, individually and in his official )
capacity as Chairman of the Board of )
Trustees, )
 )
      Defendants. )

This cause comes before the Court on defendant Washington Montessori, Inc.'s motions to dismiss plaintiffs' complaint and amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs have responded, the moving defendant has replied, and a hearing was held before the undersigned on September 5, 2025, at Raleigh, North Carolina. In this posture, the motions are ripe for disposition. For the reasons that follow, the motion to dismiss the original complaint is denied as moot and the motion to dismiss the amended complaint is granted in part and denied in part.

## BACKGROUND

Plaintiffs instituted this action by filing a complaint on February 12, 2025. [DE 1]. Plaintiffs amended their complaint on May 14, 2025. [DE 15]. In their amended complaint, plaintiffs allege claims arising from defendants' alleged denial of a free and appropriate public education (FAPE) to their daughter, KD, and retaliation against plaintiffs Plaintiffs bring claims

only on behalf of themselves, not on behalf of their daughter. KD was admitted via lottery to attend Washington Montessori Public Charter School (Washington Montessori), located in Washington, North Carolina. *Id.* ¶¶ 3; 14. KD has been diagnosed with ADHD, unspecified depressive disorder, unspecified anxiety disorder, and autism spectrum disorder and her parents have been actively engaged in her education since she began at Washington Montessori in kindergarten. *Id.* ¶¶ 11; 15; 16. Plaintiffs attended board meetings, community meetings, field trips, and events and plaintiff Julianne Dahlman volunteered regularly in the classroom. *Id.* ¶¶ 17-19.

Beginning in 2021, plaintiffs began to have concerns arising from perceived deficiencies in Washington Montessori's programming for students with disabilities, nepotism, and a preference for hiring uncertified teachers and administrators. *Id.* ¶¶ 25-26. Plaintiffs attended and spoke at board meetings to raise these issues, but their comments and concerns were omitted from the Board's meeting minutes. *Id. Id.* ¶¶ 20-22. Plaintiffs questioned the use of the label "HQ" next to certain staff members' names on the school's website, when those individuals lacked proper North Carolina Department of Public Instruction credentials to be designated as "highly qualified." *Id.* ¶¶ 27-32. Plaintiffs also questioned using a company owned by Washington Montessori's Executive Director, defendant Jamie Midgette, to lease instruments and instructional materials to the school's students. *Id.* ¶ 40. Plaintiff Daniel Dahlman also made Freedom of Information Act (FOIA) requests for the school's vendor list but did not receive a response. *Id.* ¶¶ 34, 39.

In January 2022, the Board implemented a new policy which permits the administration to ban any parent from campus who directly or indirectly threatens the school community. *Id.* ¶ 35-36. On August 17, 2022, plaintiffs were banned from campus. *Id.* ¶ 96. The letter informing plaintiffs of the ban accused them of engaging in "a campaign to discredit our school, the board, and its leadership," "threaten[ing] board members and administration" and that plaintiffs'

2

"communications ha[d] crossed the line from concerned parents to disrespectful, aggressive, and uncivil." *Id.* ¶¶ 97-100. Plaintiffs were instructed not to contact the school, except where it directly concerned KD's education, and were prohibited them from school property except to drop off and pick up KD. *Id.* ¶¶ 101-102.

In June 2022,[1] a recording of a November 2021 Board of Trustees meeting was re-posted on a Facebook group of Washington Montessori parents. *Id.* ¶ 42. The adult son of a Board member commented that he was tired of seeing the school being "bashed" on social media, citing to conduct by defendant Midgette and others after his soccer coach had abruptly quit. Ms. Dahlman commented that the soccer coach had not quit, but rather had been fired when it was determined that he was a sex offender and had been hired without a background check being conducted by the school. In response to comments made in the Facebook group, plaintiffs contacted the Washington Police Department about hiring an off-duty officer to attend board meetings. *Id.* ¶¶ 45-52.

In November 2022, plaintiffs received Washington Montessori's Board Policy, which included prohibitions on disruptive actions which interfere or threaten to interfere with classroom operations, board meetings, school events, the car line or parking lot, or other areas of the school, as well as defamatory, offensive, or derogatory comments on social media sites regarding the school or its students, staff, or board. *Id.* ¶¶ 121-124. The Board Policy provided that failure to follow the policy provisions regarding campus and social media behavior would result in, among other things, banning a parent for a period of time or contacting authorities. *Id.* ¶ 125. Plaintiffs allege that these policy provisions were retaliatory to plaintiffs and KD. *Id.* ¶ 122.

On January 12, 2023, plaintiffs filed a complaint with the Office of Civil Rights. *Id.* ¶ 130. In July 2023, plaintiffs were notified by the Office of Civil Rights that the investigation had been

---

[1] The complaint identifies this incident as occurring in June 2023, but the Court presumes this incident took place in June 2022 based on the remaining allegations.

dropped, and plaintiffs allege that the notification letter included several new, allegedly false claims made against plaintiffs by Midgette. *Id.* ¶¶ 154-55. The January 2023 complaint was closed and plaintiffs were informed they could file a new claim. *Id.* ¶ 157.

In February 2023, plaintiffs were notified by Washington Montessori about a drawing by KD depicting a person who had hanged themselves and was dripping blood. Plaintiffs were instructed that if KD did not see a mental health provider within three days the school would contact a mobile crisis unit to assess KD. *Id.* ¶¶ 131-132. Plaintiffs allege that KD's mental health deterioration is a result of their being banned from school property. *Id.* ¶ 133. In April 2023, Washington Montessori sent plaintiffs KD's student records in response to plaintiffs' request. This included a fifty-page handwritten journal containing teachers' observations of KD. The journal included a note describing KD having vomited in the hallway, that KD was made to clean it up, and that KD was not permitted to use the phone to notify her parents if she vomits. Plaintiffs allege that Washington Montessori withheld this information from plaintiffs which resulted in inadequate support and accommodation at school for KD's anxiety. *Id.* ¶¶ 138-145.

In August and September 2023, plaintiffs notified Washington Montessori that KD's anxiety was escalating, she was refusing to go to school, and she was displaying aggressive behavior at home. Plaintiffs attributed this increase in KD's anxiety to her inability to attend extracurricular activities and have her parents with her at school events. In September 2023, plaintiff Daniel Dahlman emailed the Board of Trustees to inquire whether plaintiffs remained banned from campus, and was informed that the ban remained in place. *Id.* ¶¶ 158-165. Plaintiffs allege that Midgette made the decision to continue the ban unilaterally. *Id.* ¶¶ 166.

On October 10, 2023, plaintiff Julianne Dahlman received a letter from Washington Montessori informing her that on October 4, 2023, she was speeding and almost hit students in the

4

car line at Washington Montessori. Ms. Dahlman was informed that her driving privileges on campus were revoked. *Id.* ¶ 173. Two hours after receiving the letter, Ms. Dahlman received a phone call from Washington Montessori's social worker informing her that KD had cut herself while in the girls' restroom. Mr. Dahlman rushed to school to pick up KD, where KD's teacher informed him that she was unaware of the cutting incident. Mr. Dahlman had started to drive away with KD when he noticed blood over the wrist areas of KD's sweatshirt; Mr. Dahlman circled back through the car line to inform a Sheriff's deputy who was at the school. *Id.* ¶¶ 174-178. Mr. Dahlman was interviewed by the Sheriff's Deputy about the incident, and shortly after this incident, the Sheriff's deputy became a member of Washington Montessori's Board of Trustees. *Id.* ¶¶ 178-179.

On October 11, 2023, Ms. Dahlman responded to her driving ban via email, noting she had dashcam footage exonerating her. On October 17, 2023, Mr. Dahlman sent a FOIA request for surveillance footage of Ms. Dahlman's alleged October 4 car line incident, but was told that video footage is not a part of public records requests. *Id.* ¶¶ 180-182. On October 21, 2023, Mr. Dahlman received a letter banning him from campus due to the October 10, 2023, car line incident. Mr. Dahlman responded to the driving letter ban on October 23, 2023, attaching dashcam footage and requesting an official grievance against Midgette. *Id.* ¶¶ 183-184.

In early November 2023, plaintiffs dropped KD at the end of the Washington Montessori driveway and requested that KD be escorted to the school. Washington Montessori staff failed or refused to escort KD, which plaintiffs allege was a violation of KD's student support plan. *Id.* ¶¶ 191-192. On January 2, 2024, Washington Montessori responded to plaintiffs' Family Educational Rights and Privacy Act (FERPA) and FOIA requests and requested that plaintiffs pay $2,000 as a

5

downpayment to research, review, and print the records. Plaintiffs indicated that they would receive the documents electronically at their own expense. *Id.* ¶¶ 206-07.

On February 1, 2024, plaintiffs' Office of Civil Rights complaint was accepted and an official investigation was opened. *Id.* ¶ 214. An Individualized Education Program (IEP) meeting for KD was scheduled for February 8, 2024, via Zoom, and plaintiffs were informed that they would be muted if they spoke too long, went off topic, or berated school staff. Plaintiffs allege that this was a violation of Section 504 of the Rehabilitation Act. *Id.* ¶¶ 215-17. Plaintiffs informed Washington Montessori staff on February 7, 2024, that there would be no need to hold the IEP meeting until plaintiffs had received outstanding FERPA requests. Plaintiffs nonetheless attempted to log in to in the Zoom IEP meeting and emailed the IEP team to inform them they were waiting for the meeting but received no response. The meeting was held without plaintiffs and plaintiffs allege that significant changes were made to KD's IEP during the meeting and without their input. *Id.* ¶¶ 221-230.

Plaintiffs received a disciplinary action email regarding KD's behavior on February 15, 2024. KD had gotten out of her seat without permission. The following day, Ms. Dahlman received a phone call informing her that KD would be suspended for one day for failing to follow the instructions of an adult. Ms. Dahlman was told that if she did not have KD picked up by 11:45 a.m. KD would be suspended for an additional day. Due to being banned from campus, Ms. Dahlman had to schedule a ride share service to pick KD up from school. KD received an additional day of suspension because she was not picked up by 11:45. *Id.* ¶¶ 237-39.

Also on February 16, 2024, the Beaufort County Department of Social Services (Social Services) called plaintiffs to state they were on the way to plaintiffs' home due to a complaint. The social worker interviewed plaintiffs and KD and informed plaintiffs that Social Services had been

informed that KD watched a disturbing video on YouTube. Plaintiffs learned that KD had informed the Washington Montessori social worker about a year earlier about a disturbing video her cousin had shown her. *Id.* ¶¶ 240-250. On February 26, 2024, Mr. Dahlman visited Social Services and reported that one of KD's teachers had physically pulled KD's arm to get KD to move to another classroom, and that the contact resulted in a bruise. *Id.* ¶ 252. Plaintiffs then reported the same incident to the Washington Police Department on March 13, 2024. On March 14, 2024, a police officer met with Washington Montessori staff who reported there were no cameras in the school and that the teacher would not speak about the incident without an attorney. *Id.* ¶ 265. On March 16, 2025, KD was suspended for an additional ten days for having alleged that a teacher harmed her. *Id.* ¶ 268. On March 29, 2024, the Washington Police Department investigation into the incident was closed. *Id.* ¶ 283.

On April 29, 2024, plaintiffs were contacted by Social Services concerning a complaint of truancy. Plaintiffs informed a social worker on May 1, 2024, that they had filed a lawsuit against Washington Montessori and that their ban from campus and the lack of ride share services in the area were the reasons for KD's tardiness. On May 19, 2024, plaintiffs were served with criminal charges for truancy. *Id.* ¶¶ 285-291. In January 2025, Washington Montessori instituted a ban on ride share services for students under the age of thirteen, which plaintiffs allege was intended to retaliate against them. *Id.* ¶¶ 297-303.

In their amended complaint, plaintiffs allege the following claims for relief: retaliation in violation of Section 504 of the Rehabilitation Act of 1973, retaliation in violation of the First Amendment to the United States Constitution under 42 U.S.C. § 1983, malicious prosecution and abuse of process, and intentional infliction of emotional distress.

7

## DISCUSSION

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a claim for lack of subject matter jurisdiction. "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (citation omitted). When subject-matter jurisdiction is challenged, the plaintiff has the burden of proving jurisdiction to survive the motion. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999). When a facial challenge to subject-matter jurisdiction is raised, the facts alleged by the plaintiff in the complaint are taken as true, "and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). The Court can consider evidence outside the pleadings without converting the motion into one for summary judgment. *See, e.g., Evans*, 166 F.3d at 647.

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). When acting on a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and mere recitals of the elements of a cause of action supported by conclusory statements do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed if the factual allegations do not nudge the plaintiff's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

At the outset, the Court denies defendant Washington Montessori's motion to dismiss the original complaint as moot. *See Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017).

A. *Section 504 of the Rehabilitation Act claim*

As to the amended complaint, Washington Montessori first argues that plaintiffs lack standing to assert and have failed to exhaust their Section 504 Rehabilitation Act claim. A court lacks subject matter jurisdiction to hear a plaintiff's claims where the plaintiff lacks Article III standing. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458-59 (4th Cir. 2005). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Section 504 of the Rehabilitation Act prohibits, among other things, retaliation against covered individuals for engaging in protected activity. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016). Plaintiffs allege that KD is an individual with a disability under the Rehabilitation Act and that they and KD have been retaliated against for advocating for KD's education. [DE 15] ¶¶ 305-07. KD is not a plaintiff in this action, and plaintiffs Julianne and Daniel Dahlman thus allege an associational claim for retaliation under the Rehabilitation Act.

> In addition to the constitutional standing requirements, the federal judiciary has developed a prudential limitation on standing where the plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." However, Section 504 creates a right of action for persons or entities whose claims might otherwise be barred by these prudential considerations. Specifically, Section 504 permits "any person aggrieved" by unlawful discrimination to bring an action. Courts have interpreted this language to prohibit discrimination against an individual based on his or her

> association with a disabled person. Nevertheless, "an associational discrimination claim requires a separate and distinct denial of a benefit or service to a non-disabled person and may not be premised on a derivative benefit or harm based on treatment towards a disabled person."

*D.N. v. Louisa Cnty. Pub. Sch.*, 156 F. Supp. 3d 767, 772 (W.D. Va. 2016) (cleaned up, internal citations omitted). "[C]ourts have held that parents who attempt to recover independently for a violation of their children's rights do not have standing under the ADA or the [Rehabilitation Act]." *Ahmed v. Napolitano*, 825 F. Supp. 2d 112, 116 (D.D.C. 2011).

"To state an associational discrimination claim under Section 504, a plaintiff 'must plausibly allege: (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination." *Stukes v. Sch. Bd. of City of Virginia Beach*, No. 2:18CV644, 2019 WL 13298146, at *7 (E.D. Va. Nov. 21, 2019) (citation omitted); *see also Sanford v. Sumter Sch. Dist.*, No. CV 3:25-3807-SAL-SVH, 2025 WL 2201113, at *5 (D.S.C. June 17, 2025), *report and recommendation adopted,* No. 3:25-CV-3807-SAL, 2025 WL 2200999 (D.S.C. Aug. 1, 2025) (citation omitted). Here, plaintiffs' allegations of retaliation in violation of the Rehabilitation Act are based their advocacy for KD's education. But they have not plausibly alleged that they suffered retaliation because of their association with KD, or, where they have plausibly alleged that they suffered retaliation because of their association with KD, they have failed to plausibly allege any direct harm. For example, plaintiffs allege that they were retaliated against by being banned from campus, resulting in, among other things, criminal truancy charges. But the complaint's allegations show that plaintiffs were banned from campus due to plaintiffs' own conduct, not because of their association with KD. Plaintiffs further allege that they were prevented from participating in KD's IEP meetings, that plaintiffs were denied sufficient access to KD's records, that KD was suspended and disciplined

10

inappropriately, and that KD's IEP was inappropriately modified. But plaintiffs have failed to plausibly allege that any of these actions caused them to suffer direct injury. *See D.N.*, 156 F. Supp. 3d at 773 (emotional and financial harms arising from discrimination against student insufficient to demonstrate prudential standing); *Parrott v. Florence Sch. Dist. One*, No. CV 4:23-2375-JD-KDW, 2023 WL 7287357, at *3 (D.S.C. July 18, 2023), *report and recommendation adopted*, No. 4:23-CV-2375-JD, 2023 WL 7102164 (D.S.C. Oct. 27, 2023) (derivative harm based on treatment of student insufficient); *see also Glass v. Hillsboro Sch. Dist. 1J*, 142 F. Supp. 2d 1286, 1292 (D. Or. 2001) (where parents fail to allege that they, rather than their child, had a right to services from defendant, parents fail to demonstrate associational standing).

Plaintiffs have failed to plausibly allege an associational retaliation claim under the Rehabilitation Act, and this claim is therefore dismissed.[2]

B. *First Amendment claim*

Defendants next argue that plaintiffs have failed to plausibly allege that they were deprived of their free speech rights under the First Amendment.

"The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (citation omitted). Retaliation in violation of the First Amendment is actionable because it tends to chill the exercise of constitutional rights. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). "To establish a First Amendment retaliation claim, a plaintiff must prove three elements: (i) that his speech was protected; (ii) that the defendant's alleged retaliatory action adversely affected his constitutionally protected speech; and (iii) that a causal relationship existed

---

[2] The Court, therefore, declines to consider defendants' argument that plaintiffs have failed to exhaust this claim and that it is barred by claim-splitting or res judicata.

11

between his speech and the defendant's retaliatory action." *Trulock v. Freeh*, 275 F.3d 391, 404 (4th Cir. 2001). However, "[w]here there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." *Am. C.L. Union of Maryland, Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

Here, plaintiffs allege that they engaged in protected speech when they questioned the qualifications of school staff and when they communicated with other parents about their concerns and discussed their concerns at public board meetings. Plaintiffs allege that their ban from campus was specifically designed to prevent plaintiffs from raising issues of concern and that the ban adversely impacted their constitutionally protected speech. [DE 15] ¶¶ 312-316. In opposition to the motion to dismiss, plaintiffs argue that they consistently engaged in First Amendment activity by reporting their concerns to government agencies such as the North Carolina Auditor Hotline and the Washington Police Department. [DE 22] at 25. Plaintiffs argue that, shortly after they contacted the Washington Police Department, they were banned from campus except for the car line. Plaintiffs also point to their filing of multiple petitions with the Office of Administrative Hearings regarding KD's right to a FAPE as First Amendment protected activity, as well as reports to the Department of Social Services and the Washington Police Department regarding truancy as evidence of retaliation.

It is true that "[s]chool officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999); *see also Davison v. Rose*, 19 F.4th 626, 641 (4th Cir. 2021) ("*Lovern* establishes the constitutionality of no-trespass bans against parents attempting to enter school

12

grounds."). However, plaintiffs have plausibly alleged that their ban from campus and the car line adversely affected their protected speech, in that it would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (citation omitted); *see also Davison v. Rose*, No. 116CV540AJTIDD, 2019 WL 13193754, at *14 (E.D. Va. July 31, 2019) (parent plausibly alleged First Amendment retaliation when he was banned from campus as a public safety threat after he questioned school decisions). At this early stage, plaintiffs' allegations are sufficient to go forward on their First Amendment retaliation claim. The motion to dismiss this claim is denied.

C. *Malicious prosecution and abuse of process claim*

To prove malicious prosecution, "a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." *Turner v. Thomas*, 369 N.C. 419, 425 (2016). Malice in this context can be demonstrated by proving that the defendant either "was motivated by personal spite and a desire for revenge or that defendant acted with reckless and wanton disregard for plaintiffs' rights." *Fox v. City of Greensboro*, 279 N.C. App. 301, 316 (2021) (internal quotations omitted, quoting *Becker v. Pierce*, 168 N.C. App. 671, 676 (2005)). But even at this stage of the proceeding, a plaintiff must come forward with more than mere legal conclusions and recitations of the elements to sufficiently allege malice. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("malice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated.").

This claim rests on plaintiffs' allegations that Washington Montessori made reports to the Department of Social Services regarding suspected improper supervision of KD and excessive absences from school. Under North Carolina law, a school has a duty to report suspected child

13

neglect to the Department of Social Services. N.C. Gen. Stat. §§ 7B-301, 115C-400. Schools are also required to report truancy. *Id.* § 115C-378(e)-(f). Persons who make reports to the Department of Social Services in good faith are immune from civil liability. *Id.* ¶ 7B-309. Moreover, certainly as regards the criminal truancy charges, while Washington Montessori allegedly made the truancy report to the police, the police initiated charges, suggesting the presence of probable cause.

Finally, plaintiffs' allegations of malice are conclusory and speculative in the complaint. *See, e.g.,* [DE 15] ¶ 328. Plaintiffs have failed to plausibly allege a claim for malicious prosecution, and this claim is properly dismissed.

In a single claim, plaintiffs have alleged a claim for both malicious prosecution and abuse of process, and Washington Montessori's motion does not expressly argue for dismissal of plaintiffs' claim for abuse of process. Accordingly, plaintiff's claim for abuse of process may proceed. *See Fox*, 279 N.C. App. at 326 (noting "distinction between malicious prosecution and abuse of process is that malicious prosecution requires a claim to be improperly instituted, whereas abuse of process requires a wrongful or improper act after the institution of process.").

D. *Intentional Infliction of Emotional Distress*

To prevail on a claim for intentional infliction of emotional distress (IIED), a plaintiff must be able to show "(1) extreme and outrageous conduct; (2) which is intended to cause and does cause (3) severe emotional distress to another." *May v. City of Durham*, 136 N.C. App. 578, 586 (2000). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 493 (1986) (citing Restatement (Second) of Torts § 46 comment (d) (1965)). Plaintiffs allege that reporting truancy and suspected neglect to the Department of Social Services

and law enforcement, banning plaintiffs from campus, and other actions in the complaint support their intentional infliction of emotional distress claim. Plaintiffs have failed to plausibly allege any extreme, atrocious, or utterly intolerable behavior on the part of Washington Montessori. This claim is appropriately dismissed.

## CONCLUSION

Accordingly, for the foregoing reasons, the motion to dismiss the original complaint [DE 12] is DENIED AS MOOT.

The motion to dismiss the amended complaint [DE 18] is GRANTED IN PART and DENIED IN PART. Plaintiffs' First Amendment retaliation and abuse of process claims may proceed, and plaintiffs' Rehabilitation Act and intentional infliction of emotional distress claims are dismissed.

Defendant Midgette has not appeared in this action and the docket does not reflect that he has been served. Fed. R. Civ. P. 4(m) requires that service on a party must be effected not more than ninety days from the filing of the complaint. Plaintiffs shall, within fourteen days of the date of entry of this order, demonstrate why defendant Midgette should not be dismissed pursuant to Fed. R. Civ. P. 4(m).

SO ORDERED, this 10 day of December 2025.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE